# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| IN RE MERGE HEALTHCARE INC. | ) |  |
| STOCKHOLDERS LITIGATION | ) Consol. C.A. No. 11388-VCG |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## MEMORANDUM OPINION

Date Submitted: October 11, 2016
Date Decided: January 30, 2017

Seth D. Rigrodksy, Brian D. Long, Gina M. Serra, Jeremy J. Riley, of RIGRODSKY & LONG, P.A., Wilmington, Delaware; James R. Banko, Derrick B. Farrell, of FARUQI & FARUQI, LLP, Wilmington, Delaware; OF COUNSEL: Nadeem Faruqi, of FARUQI & FARUQI, LLP, New York, New York; Juan E. Monteverde, of MONTEVERDE & ASSOCIATES PC, New York, New York, *Attorneys for Plaintiffs*.

David J. Teklits, D. McKinley Measley, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Howard S. Suskin, of JENNER & BLOCK LLP, Chicago, Illinois, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This litigation involves the acquisition of Merge Healthcare, Inc. ("Merge" or the "Company") by IBM (the "Merger"). The matter is before me on the Defendants' motion to dismiss. The Merger was supported by a vote of close to 80% of Merge stockholders. The Plaintiffs, former Merge stockholders, seek post-closing damages against the Company's directors for what the Plaintiffs allege was an improper sale process. Such damages are typically problematic, because they require a demonstration that the directors breached the duty of loyalty, a rather difficult target for a plaintiff to hit. Here, however, Merge has chosen to forgo an exculpation clause in its corporate charter. Therefore, the Director Defendants are exposed to liability for acts violative of their duty of care, in the context of what the Complaint describes as a less-than-rigorous sales process. Demonstrating such a violation is not trivial: it requires a demonstration of gross negligence. Nonetheless, it is less formidable than showing disloyalty.

Before considering whether the Complaint states a claim for fiduciary duty violations, however, I must first consider whether the vote of a majority of disinterested shares in favor of the Merger serves to cleanse any such violations, raising the presumption that the Directors acted within their proper business judgment. The vote here will have such an effect,[1] but only if it was uncoerced and

---

[1] Leaving only, theoretically, liability for waste, which is not alleged here. The carve-out for waste is an interesting judicial construct; it is difficult to envision a majority vote in favor of a transaction so unfavorable as to constitute waste. The hoary doctrine of waste is best viewed here as a kind

1

fully informed. I find that such is the case; therefore, the motion to dismiss is granted. My reasoning follows.

## I. BACKGROUND[2]

*A. The Parties*

The Plaintiffs are the owners of Merge common stock and have been continuously throughout all relevant times.[3] The Complaint lists the entire Merge Board as the Defendants, consisting of Michael Ferro, Justin Dearborn, William J. Devers, Neele E. Stearns Jr., Michael P. Cole, Matthew M. Maloney, and Richard A. Reck.

Defendant Ferro served as Chairman of the Board of the Company from June 2008 to August 2013 and from November 21, 2014 until the Merger.[4] Ferro was the founder and CEO of Click Commerce, Inc. ("Click"), which he sold in 2006.[5] That same year, Ferro started Merrick Ventures LLC ("Merrick"), where he is currently the Chairman and CEO.[6] At the close of the Merger, Ferro, through Merrick, received $188 million in "immediate liquidity."[7]

---

of "judicial out," a way around the strictures of the cleansing rule given a fact situation of some undefined level of egregiousness, such that equity would intervene.

[2] The facts, drawn from Plaintiffs' Verified Consolidated Amended Class Action Complaint (the "Complaint"), judicially noticeable facts in publicly available SEC filings, and from documents incorporated by reference therein, are presumed true for purposes of evaluating Defendants' Motion to Dismiss.

[3] Compl. ¶ 28.

[4] *Id.* at ¶ 30.

[5] *Id.* at ¶¶ 4, 30.

[6] *Id.* at ¶¶ 4, 30.

[7] *Id.* at ¶¶ 30, 71.

Defendant Dearborn "served as the Company's President, CEO, Corporate Secretary and Director of the Board at all relevant times."[8] Ferro appointed Dearborn to the Board of the Company in 2008.[9] Dearborn and Ferro worked together at Click for nine years before its sale in 2006. Dearborn has also spent time as the Managing Director and General Counsel of Merrick, Ferro's LLC.[10]

Defendant Devers served on the Board of the Company from February 2014 until the close of the Merger.[11] Devers also served as a director of Click until its sale in 2006.[12] After the sale of Click, Devers joined the board of Merrick.[13] He was also previously employed by IBM.[14] Devers received over $3.8 million in immediate liquidity upon the close of the Merger.[15]

Defendant Stearns served on the Board of the Company from June 2008 until the close of the Merger.[16] He also served as the Chairman of the Audit Committee and as a member of both the Compensation and Executive Committees.[17] Stearns

---

[8] *Id.* at ¶ 31.
[9] *Id.*
[10] *Id.*
[11] *Id.* at ¶ 32.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.* at ¶ 17.
[16] *Id.* at ¶ 33.
[17] *Id.*

also served as a director of Click "until its sale in 2006."[18]  Stearns received over $5.9 million in immediate liquidity upon the close of the Merger.[19]

Defendant Cole served on the Board of the Company from April 23, 2015 until the close of the Merger.[20]  Cole also served with Ferro on the boards of Big Shoulders Fund and Lyric Opera of Chicago.[21]

Defendant Maloney served on the Board of the Company from August 2012 until the close of the Merger.[22]  Maloney received over $1.62 million in immediate liquidity upon the close of the Merger.[23]

Defendant Reck served on the Board of the Company from April 2003 until the close of the Merger.[24]  Reck owned approximately 4,000 shares of IBM before the close of the Merger, a fact he did not disclose until the day before the Board approved the Merger Agreement.[25]  Reck and Ferro have known each other for approximately twenty years.[26]  Reck received over $5.4 million in immediate liquidity upon the close of the Merger.[27]

---

[18] *Id.* at ¶ 33.
[19] *Id.* at ¶ 17.
[20] *Id.* at ¶ 34.
[21] *Id.*
[22] *Id.* at ¶ 35.
[23] *Id.* at ¶ 17.
[24] *Id.* at ¶ 36.
[25] *Id.*
[26] *Id.*
[27] *Id.* at ¶ 17.

## B. Relevant Non-parties

Non-party Merge Healthcare, Inc. was a Delaware corporation with its principal offices in Chicago, Illinois.[28] The Company's business was the development of healthcare software.[29] Previous Defendant but now non-party Goldman, Sachs & Co. ("Goldman") is an investment bank that was retained by the Company to provide financial advice in connection with its possible sale.[30] Non-party IBM is a New York corporation that provides information technology products and services.[31] Non-party Datong Acquisition Corp. ("Merger Sub") is a Delaware corporation and a wholly owned subsidiary of IBM.[32] Merger Sub was merged with and into Merge and ceased its corporate existence upon the completion of the Merger.[33]

## C. Factual Overview

The Plaintiffs brought this class action on behalf of themselves and other public stockholders of the Company for damages resulting from IBM's acquisition of the publicly owned shares of the Company.[34] On August 6, 2015, the Company's Board of Directors entered the Company into an Agreement and Plan of Merger (the

---

[28] *Id.* at ¶ 29.
[29] *Id.*
[30] *Id.* Goldman was dismissed from this action without prejudice on June 9, 2016.
[31] Compl. ¶ 38.
[32] *Id.* at ¶ 39.
[33] *Id.*
[34] *Id.* at ¶ 1.

"Merger Agreement") pursuant to which the Company's common stockholders received $7.13 in cash for each of their shares, which represented a 31.8% premium to the closing price of $5.41 per share of the Company's common stock on August 5, 2015.[35] The holders of the Company's Series A Convertible Preferred Stock received $1,500 in cash for each of their shares of Preferred Stock.[36] The Merger was completed on October 13, 2015 at an approximate value of $1 billion.[37] 77.3% of the Company's outstanding shares were voted in favor of the Merger.[38] As part of the Merger, certain members of Company management entered into employment or transition arrangements with IBM, including one of the Defendants, Dearborn.[39]

### 1. Ferro's Journey

As a reminder, Ferro started serving as Chairman of the Board in 2008.[40] Ferro is also Chairman and CEO of Merrick, which in May 2008 "bought a controlling interest in Merge by paying $5 million and making a $15 million loan, which was repaid in 2009."[41] At that time, Ferro, through Merrick, owned 50.1% of the Company.[42] Merrick started selling off its shares in 2009, holding 38.1% at the

---

[35] *Id.* at ¶ 2; Defs' Opening Br., Transmittal Aff. of D. McKinley Measley, Esq., Ex. 3, Merge Healthcare, Inc. Definitive Proxy Statement at 32 (Sept. 11, 2015) (the "Proxy").
[36] Compl. ¶ 2.
[37] *Id.*
[38] Defs' Opening Br., Transmittal Aff. of D. McKinley Measley, Esq., Ex. 6, 10/14/2015 Merge Form 8-K at 2.
[39] Compl. ¶ 7.
[40] *Id.* at ¶ 30.
[41] *Id.*
[42] *Id.* at ¶ 70.

end of 2010 and 26.62% as of August 26, 2015.[43] The Company's December 31, 2014 10-K states

> Mr. Ferro indirectly owns or controls all of the shares of our common stock owned by Merrick Ventures and Merrick Holdings. Due to their stock ownership, Merrick Ventures and Merrick Holdings have significant influence over our business, *including the election of our directors*. . . . Merrick Ventures' and Merrick Holdings' significant ownership of our voting stock will enable it to influence or *effectively control us* and the influence of our large stockholders could impact our business strategy and also have the effect of *discouraging others from purchasing* or attempting to take a control position in our common stock, thereby increasing the likelihood that the market price of our common stock will not reflect a premium for control.[44]

Ferro resigned from Merge's Board in August 2013 due to health reasons but rejoined in November 2014 and was appointed Chairman.[45]

### 2. The Consulting Agreement

Merrick had a consulting agreement with the Company that had expired on December 31, 2013.[46] On May 29, 2015, "instead of a compensation package for Ferro,"[47] the Company approved an amended consulting agreement between the Company, Ferro, and Merrick (the "Consulting Agreement").[48] Under the Consulting Agreement, "Merrick agreed to provide services to the Company that

---

[43] *Id.*
[44] *Id.* at ¶ 69 (emphasis in original). Merrick owned 26.9% of Merge common stock as of December 31, 2014. *Id.* at ¶ 70.
[45] *Id.* at ¶¶ 72–73.
[46] *Id.* at ¶ 79.
[47] Proxy at 20.
[48] Compl. ¶ 80.

included product development and strategic planning" and "the Company agreed to reimburse Merrick's expenses related to" those services.[49] Most notably, the Board agreed that the Company would pay Merrick a one-time fee of $15 million in cash if the Company consummated a strategic transaction "at an aggregate enterprise value of at least $1 billion" (the "Consulting Agreement Fee").[50]

### 3. The Sale to IBM

Since 2012, the Company has reviewed its strategic alternatives and met with potential financial and strategic acquirors.[51] In 2013 into early 2014, the Company received interest in possible acquisitions of or investments in "certain of [their] businesses or [the] Company as a whole," but the Company did not receive "any concrete proposals" that senior management and the Board believed "represented an attractive price . . . or would significantly increase stockholder value."[52] In October 2014, Dearborn met with a potential financial investor, Party A, and the Company entered into a confidentiality agreement with Party A one month later.[53] Party A expressed interest at $2.60 per share during a month when the Company's common

---

[49] *Id.*
[50] *Id.*
[51] Proxy at 19.
[52] *Id.*
[53] *Id.*

stock traded in a range of $2.76 to $3.40 per share.[54] The Company determined it could not reach an agreement with Party A.[55]

In early 2015, Ferro and senior management developed a business strategy code-named "eMed" that "would utilize the Company's access to medical diagnostic images and the availability of cheaper and faster computing and artificial intelligence capabilities to develop a new business line for the Company."[56] Ferro sought investors and potential business partners for the eMed idea, reaching out to several industry participants, including IBM.[57]

Ferro, Jon Devries, a Vice President in the Company, and Dearborn met with IBM representatives and discussed the eMed idea at an industry conference on April 13, 2015.[58] In May 2015, IBM expressed an interest in acquiring Merge.[59] On July 7, 2015, IBM "submitted an exclusivity agreement" reflecting a proposed offer of $5.65 per share in cash that was conditioned on an exclusivity agreement and employment and retention arrangements with certain members of the Company's management.[60] After meeting on July 9, 2015, the Board told Ferro and Dearborn to convey to IBM that it was unwilling to enter into an exclusivity agreement at the

---

[54] *Id.*
[55] *Id.*
[56] Compl. ¶ 74.
[57] Compl. ¶ 76; Proxy at 20.
[58] Compl. ¶ 78; Proxy at 20.
[59] Compl. ¶ 78.
[60] *Id.* at ¶ 81.

9

proposed price of $5.65.[61] The Board also authorized Ferro and Dearborn to enter into an "appropriate" exclusivity agreement if IBM raised its proposed purchase price in such a way "that better reflected [the Board's] view of [the Company's] value. . . ."[62] Accordingly, "on July 10, 2015, Ferro and Dearborn entered Merge into an exclusivity agreement with IBM at a proposed purchase price of $1 billion, or $7.00 per share."[63] The exclusivity agreement would last until August 27, 2015.[64] The Board met on July 14, 2015 and reviewed the interest levels of other potential buyers.[65] Company counsel also reviewed the directors' fiduciary duties.[66] During the week of July 24, 2015, legal counsel to IBM, Merge, and Ferro/Merrick began negotiating terms of a merger agreement.[67] Also during this week, the Board, senior management, and Company counsel discussed forming a special committee "that would not include Ferro to negotiate the Merger with IBM *in light of* the payment that would become due under the [Consulting Agreement]."[68] Ultimately, the Board declined to form such a committee, an act the Plaintiffs allege was against the wishes of counsel.[69] On July 29, 2015, "Ferro suggested that if IBM were willing to increase

---

[61] Proxy at 21.
[62] *Id.*
[63] Compl. ¶ 83.
[64] Proxy at 22.
[65] Compl. ¶ 84.
[66] Proxy at 22.
[67] Compl. ¶ 85.
[68] *Id.* at ¶ 89 (emphasis added).
[69] *Id.*

10

its offer price, Merrick would consider waiving" the $15 million Consulting Agreement Fee.[70] IBM obliged, increasing its offer from $7.00 to the final deal price of $7.13 per share, representing a $15 million increase, and Ferro agreed to waive the $15 million consulting fee if the Company entered into the Merger with IBM.[71] The Board met on August 5, 2015 to consider and vote on IBM's proposal, if appropriate.[72] Goldman presented a fairness opinion to the Board stating that the $7.13 per share offer was "fair from a financial point of view."[73] Company counsel reviewed the terms of the Merger Agreement with the Board, as well as the Board's fiduciary duties yet again.[74] After "further review and discussion," the Board "resolved to approve" the Merger Agreement and recommend that the Company stockholders approve the Merger Agreement.[75] Dearborn recused himself from the vote due to negotiating post-closing employment with IBM.[76] The Board caused the Company to enter into the Merger Agreement on August 6, 2015, and the Merger was completed on October 13, 2015.[77] 77.3% of the Company's outstanding shares

---

[70] *Id.* at ¶ 90.
[71] *Id.* at ¶¶ 90–91.
[72] Proxy at 24.
[73] *Id.*
[74] *Id.* at 25.
[75] *Id.*
[76] *Id.*
[77] Compl. ¶ 2.

were voted in favor of the Merger.[78]  The Defendants filed a definitive proxy statement in connection with the Merger.[79]

### 4. The Deal Protections

The Merger Agreement included certain deal protections.[80]  A "no-solicitation" provision prohibited the Company from shopping itself.[81]  An "information rights" provision required the Company to notify IBM within twenty-four hours upon the receipt of an inquiry from an unsolicited bidder that may lead to a superior proposal.[82]  The Board retained the right to change its recommendation in connection with a superior proposal if the Board determined in good faith that the failure to do so would be reasonably likely to result in a breach of the Board's fiduciary duties.[83]  However, a "force-the-vote" provision required the Board to submit the Merger to a stockholder vote even if the Board no longer recommended the Merger or even recommended against it.[84]  Also, a "matching rights" provision gave IBM five business days to match any superior proposal.[85]  Finally, the Merger

---

[78] Defs' Opening Br., Transmittal Aff. of D. McKinley Measley, Esq., Ex. 6, 10/14/2015 Merge Form 8-K at 2.
[79] Compl ¶ 117.
[80] *Id.* at ¶ 22.
[81] *Id.*  During negotiations, IBM consistently refused to allow a go-shop provision.  Proxy at 23.
[82] Compl. ¶ 22.
[83] Proxy at 27.
[84] Compl. ¶ 110.
[85] *Id.* at ¶ 22.

Agreement included a termination fee of up to $26 million, which would be paid to IBM "if the Company terminated the Merger Agreement to pursue another offer."[86]

### 5. Goldman's Fairness Opinion

In conducting its fairness opinion, Goldman relied on financial projections created by Company management for the purpose of evaluating the Merger.[87] As part of its analysis, Goldman valued the Company's Net Operating Losses ("NOLs") at $0.59 per share, treated stock-based compensation ("SBC") as a cash expense, and used an unadjusted historical beta for the Company of 1.38.[88] Goldman has done business with IBM and disclosed the extent of these past dealings on August 5, 2015—one day before the Company entered into the Merger Agreement.[89] Goldman also earned $13 million from its engagement, "all of which was contingent upon the consummation of the Merger."[90]

### D. Procedural History of the Consolidated Action

This Memorandum Opinion addresses five related actions that have been consolidated.

---

[86] *Id.*

[87] *Id.* at ¶ 101.

[88] *Id.* at ¶ 102. *But see* Pls' Answering Br. 25–26 (alleging that Goldman did not use managements' projections referred to in the Proxy that treated SBC as a cash expense but instead used a set of UFCF projections that did *not* treat SBC as a cash expense).

[89] Compl. ¶ 14, 99.

[90] Compl. ¶ 15.

The initial plaintiff filed his original Verified Class Action Complaint on August 13, 2015, just one week after the Board announced the Merger, seeking to enjoin the Merger. On September 18, 2015, the Defendants moved to dismiss or stay this matter pending the completion of a related matter in Illinois also seeking to enjoin the Merger (the "Illinois Action").[91] On September 30, 2015, the initial plaintiff, along with four other plaintiffs in related Delaware actions, moved to consolidate and appoint lead counsel, which I granted on October 6, 2015. I heard argument on Defendants' Motion to Dismiss or Stay this action in favor of the Illinois Action on October 27, 2015, after which I denied Defendants' Motion.

On November 19, 2015, the Plaintiffs moved for leave to file an amended complaint. On December 4, 2015, the Defendants moved to proceed in one jurisdiction and to dismiss or stay in the other jurisdiction, asking this Court and the Illinois Court to confer and decide the appropriate forum for the litigation. Thereafter, the matter moved forward here.

I granted Plaintiffs' motion for leave to file an amended complaint on January 7, 2016 and the Plaintiffs filed their Verified Consolidated Amended Class Action Complaint (the "Complaint") on February 8, 2016. Count I is a claim for breach of fiduciary duties against the Defendants.[92] The Plaintiffs allege that the Defendants

---

[91] *See Hazen v. Merge Healthcare, Inc.*, No. 2015-CH-12090 (Ill. Cir. Ct.).
[92] *Id.* at ¶¶ 137–144.

have violated their "duties of care, loyalty, and independence" to the Company's stockholders by putting their personal interests first, entering into the Merger through an unfair process, and depriving stockholders of the "true value inherent in and arising from" the Company.[93]  Count II is a claim for breach of the fiduciary duty of disclosure against the Defendants in which the Plaintiffs allege that the Defendants, acting in bad faith, "caused materially misleading and incomplete information to be disseminated" to the stockholders and that the Proxy failed to disclose material information.[94]  Count III was a claim for aiding and abetting breaches of fiduciary duty against Goldman, which has since been withdrawn.  The Plaintiffs seek a quasi-appraisal remedy and compensatory damages.  The Defendants moved to dismiss on February 19, 2016 under Court of Chancery Rule 12(b)(6) for failure to state a claim.  I heard oral argument on the Motion to Dismiss on September 27, 2016, after which the parties completed supplemental briefing.  This Memorandum Opinion addresses Defendants' motion.

## II. ANALYSIS

The Defendants move to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6).  When evaluating a motion to dismiss under 12(b)(6), the Court accepts well-pleaded factual allegations as true, drawing all reasonable inferences in

---

[93] *Id.*
[94] *Id.* at ¶¶ 145–149.

favor of the plaintiff.[95] The Court must deny the motion unless "the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[96] Moreover, the Defendants here rely on the cleansing effect of the stockholders' vote ratifying the transaction. To the extent the Plaintiff has alleged that the vote was uninformed, the Defendants bear the burden to show that the deficiencies alleged are spurious or immaterial as a matter of law.[97]

The Plaintiffs argue that the entire fairness standard of review applies to the Merger because a majority of the Merge board was conflicted.[98] The Plaintiffs contend that this conflict stems from "Ferro's desire to exit his Merge investment" and that all but one member of the Board was beholden to Ferro through their relationships with him.[99] The Plaintiffs also argue that these relationships with other Board members combined with Ferro's 26% stock ownership allowed him to control the Company.[100] Because I find that a fully informed, uncoerced vote of the Company's disinterested stockholders cleansed the Merger here, resulting in the application of the business judgment rule, I need not conduct an entire fairness analysis. To be clear, the Plaintiffs assert two related sources of injury—price and

---

[95] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011).

[96] *Id.*

[97] *See In re Solera Holdings, Inc. Stockholder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017).

[98] Pls' Answering Br. 40.

[99] *Id.* at 40–41.

[100] *Id.* at 41–43.

16

process claims arising from the merger, and disclosure-inadequacy claims that allegedly misled stockholders into voting for the merger and forgoing appraisal rights; the former are cleansed, and the latter mooted, by a finding of adequate disclosures to stockholders.

*A. The Stockholder Vote Cleansed the Merger*

Here, even if the stock affiliated with Ferro is taken from the calculation, a majority of the stock held by disinterested stockholders voted for the Merger. It is worth, I think, examining the rationale whereby such a vote—if uncoerced and informed—cleanses price and process claims in the merger context. Why should the Court dismiss a case where a sub-optimal sales process is credibly alleged?

The common law of Delaware, generally speaking, supports property rights and private ordering, whereby assets may be assigned to highest use. Thus, in the context of an individually-owned asset, the parties are free to negotiate a sales price without Court oversight; such self-ordering is so ingrained that the very idea of interference in such an exchange is largely unexamined. The common law of corporations concerns itself with such exchanges because of agency problems: where directors sell a corporate asset, ownership and control—and, potentially, interests—diverge; and the presence of a judicial referee is necessary to watch the watchmen. Thus, in the merger context, the Court will examine,[101] post-closing, the

---

[101] Assuming an adequate complaint.

compliance of the directors with their fiduciary duties in regard to the sale, duties themselves imposed to cure the agency problem described above. However, where a majority of the disinterested ownership of the corporate asset approves the transaction, in a manner both uncoerced and informed, the agent/principal conflict with directors is ameliorated, and the need for judicial oversight of the agents is reduced concomitantly.[102] Of course, another agency relationship, the majority dragging along the minority, remains; however, because the interests of the unaffiliated stockholders tend to be aligned, that relationship is less problematic, and is addressed statutorily via appraisal.

The cleansing effect on a transaction of a majority vote of disinterested corporate stock was explained by our Supreme Court in *Corwin v. KKR Financial Holdings LLC*.[103] "Delaware corporate law has long been reluctant to second-guess the judgment of a disinterested stockholder majority that determines that a transaction with a party other than a controlling stockholder is in their best interests."[104] Accordingly, "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[105]

---

[102] *See generally Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 313–14 (Del. 2015) (discussing policy).
[103] 125 A.3d 304 (Del. 2015).
[104] *Id.* at 306.
[105] *Id.* at 309 (internal citations omitted).

The Plaintiffs point to the language from *Corwin* quoted above to argue that if they have simply pled an entire fairness case, no cleansing is possible.[106] However, the cleansing doctrine has subsequently been clarified by this Court: as the Chancellor recently noted, "the Supreme Court did not intend [by the language quoted above] to suggest that every form of transaction that otherwise may be subject to entire fairness review was exempt" from cleansing by vote.[107] Instead, as clarified in a learned discussion by Vice Chancellor Slights in *Larkin v. Shah*,[108] "the only transactions that are subject to entire fairness that cannot be cleansed by proper stockholder approval are those involving a controlling stockholder."[109] Importantly, the mere presence of a controller does not trigger entire fairness *per se*.[110] Rather, coercion is assumed, and entire fairness invoked, when the controller engages in a conflicted transaction, which occurs when a controller sits on both sides of the transaction, or is on only one side but "competes with the common stockholders for consideration."[111] In these scenarios, "[c]oercion is deemed inherently present,"

---

[106] *See* Oral Arg. Tr. 36:16–37:4 (Sept. 27, 2016).
[107] *Solera*, 2017 WL 57839, at *6 n.28 (citing *Larkin v. Shah*, 2016 WL 4485447, at *10 (Del. Ch. Aug. 25, 2016)).
[108] 2016 WL 4485447 (Del. Ch. Aug. 25, 2016).
[109] *Id.* at *10.
[110] *Id.* at *8. *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014) ("[E]ntire fairness is the highest standard of review in corporate law. It is applied in the controller merger context as a substitute for the dual statutory protections of disinterested board and stockholder approval, because both protections are potentially undermined by the influence of the controller. However . . . that undermining influence does not exist in every controlled merger setting, regardless of the circumstances.").
[111] *Larkin*, 2016 WL 4485447, at *8.

unlike "in transactions where the concerns justifying some form of heightened scrutiny derive solely from board-level conflicts or lapses of due care."[112]  Thus, "[i]n the absence of a controlling stockholder *that extracted personal benefits*," if a majority of the Company's disinterested stockholders approves the transaction with a fully informed, uncoerced vote, then the business judgment rule applies "even if the transaction might otherwise have been subject to the entire fairness standard due to conflicts faced by individual directors."[113]  Moreover, "[w]hen the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result.  That is because the vestigial waste exception has long had little real-world relevance, because it has been understood that stockholders would be unlikely to approve a transaction that is wasteful."[114]

The Plaintiffs argue that entire fairness applies because a majority of the Board is conflicted, which as discussed above can be cleansed with an informed vote, but in doing so the Plaintiffs point to Ferro's control and/or desire for liquidity as the cause of the conflicted Board.  Given the recent and on-going development of this Court's cleansing jurisprudence, I give the Plaintiffs here the benefit of the doubt; I infer from Plaintiffs' arguments that they have adequately presented for consideration here the contention that entire fairness applies—*and* that cleansing is

---

[112] *Id.* at *12.
[113] *Id.* at *1 (emphasis added).
[114] *Singh v. Attenborough*, 137 A.3d 151, 151–152 (Del. 2016).

20

unavailable—because *Ferro* was a controlling stockholder. However, even assuming Ferro was a controlling stockholder, I find that he did not extract any personal benefits because his interests were fully aligned with the other common stockholders. Additionally, for the reasons that follow, I find that the disinterested stockholder vote was fully informed. Therefore, I find that the business judgment rule applies to the Merger and, since the Plaintiffs do not allege waste, the Complaint must be dismissed.

        1. <u>Even if Ferro was a controller, he did not extract any personal benefits.</u>

The Plaintiffs argue that the Company's own 10-K shows Ferro is a controller. As referenced above, the Company's December 31, 2014 10-K states

> Mr. Ferro indirectly owns or controls all of the shares of our common stock owned by Merrick Ventures and Merrick Holdings. Due to their stock ownership, Merrick Ventures and Merrick Holdings have significant influence over our business, *including the election of our directors*. . . . Merrick Ventures' and Merrick Holdings' significant ownership of our voting stock will enable it to influence or *effectively control us* and the influence of our large stockholders could impact our business strategy and also have the effect of *discouraging others from purchasing* or attempting to take a control position in our common stock, thereby increasing the likelihood that the market price of our common stock will not reflect a premium for control.[115]

The Plaintiffs further point towards Ferro's "longstanding business and other relationships" with "all but one member of the Board."[116] For purposes of this

---

[115] Compl. ¶ 69 (emphasis in original).
[116] Pls' Answering Br. 42–43.

Memorandum Opinion, I assume, without finding, that Ferro—despite indirect ownership of only 26% of Merge stock—was a controller.[117] The crux of rebutting a cleansing vote at the pleading stage, however, lies not merely in showing that a controller exists, but in pleading facts making it reasonably conceivable that a controller's interest was adverse to the other stockholders, as where the controller "extracted personal benefits."[118]

The Plaintiffs allege that Ferro "controlled and manipulated the sales process to obtain considerable financial benefits and career prospects for himself and his affiliates, including the majority of Merge's Board," not shared with the Company's other stockholders.[119] Specifically, the Plaintiffs argue that Ferro used his control to ensure a "quick exit" from his illiquid block of Merge stock and to have the Board approve the Consulting Agreement Fee of $15 million to Merrick if Merge was sold for over $1 billion.[120]

Regarding alleged liquidity "benefits," this Court has previously explained that

> a fiduciary's financial interest in a transaction as a stockholder (*such as receiving liquidity value for her shares*) does not establish a disabling conflict of interest when the transaction treats all stockholders equally . . . . This notion stems from the basic understanding that when a

---

[117] I note, moreover, that companies should be wary of making disclosures for securities law purposes while simultaneously asserting to the contrary for purposes of Delaware law.

[118] *Larkin*, 2016 WL 4485447, at *1 ("In the absence of a controlling stockholder *that extracted personal benefits* . . . .") (emphasis added).

[119] Compl. ¶ 68.

[120] Pls' Answering Br. 46.

22

stockholder who is also a fiduciary receives the same consideration for her shares as the rest of the shareholders, their interests are aligned.[121]

The Plaintiffs appear to concede this point, stating that "stock ownership generally aligns a director or officer's interests with other stockholders when they own 'material' amounts of stock."[122] The Plaintiffs, however, argue that "those interests diverge when the director or officer wants to exit their investment but their holdings are [so] large that they cannot be quickly sold in the open markets."[123] It is true that exigent circumstances that require a controller to dump stock, for liquidity purposes, at less than full value, create divergent interests between the controller and the other stockholders. A simple interest in selling stock on the part of the controller, by contrast, is insufficient to demonstrate divergent interests. In order for such a situation to constitute a disabling conflict, a controller must not only seek liquidity but the circumstances under which she does so must be akin to a "crisis" or a "fire sale" to "satisfy an exigent need."[124]

The Complaint states that Ferro has been slowly selling his stock for the past six years, which, to my mind, severely discredits any claims of a fire sale or a severe liquidity crunch. At any rate, the Plaintiffs conceded at Oral Argument that there is nothing in the Complaint alleging Ferro is in financial distress and that they do not

---

[121] *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1035 (Del. Ch. 2012) (emphasis added).
[122] Pls' Answering Br. 45.
[123] *Id.*
[124] *In re Synthes*, 50 A.3d at 1036.

23

allege a "fire sale" situation.[125] As such, and in light of my discussion below regarding the Consulting Agreement Fee, it seems to me that Ferro's interest here as a 26% stockholder is fully aligned with stockholders' interest to obtain the highest price possible, notwithstanding his interest, as demonstrated by a long course of dealing, in liquidating his stock.

The Plaintiffs also argue that the Consulting Agreement Fee provided a personal incentive to Ferro to place a $1 billion cap on the Merger. In the first instance, this allegation has the situation precisely backward; the Consulting Agreement Fee gave Ferro a $15 million extra incentive to want a $1 billion *floor,* not a cap, after which point he had the same incentive to maximize price as did the other stockholders. In any event, acting against his financial interest, Ferro waived this fee contractually owed to him and thus removed any personal benefit from it. He instead took the same consideration as the other stockholders and IBM increased its offer by the amount of the waived Consulting Agreement Fee. In other words, Ferro essentially forwent the full $15 million and shared it pro rata with the other stockholders of the Company. The Plaintiffs argue that this waiver came too late and that the sale process here was already "poisoned" by the existence of this fee.[126] It seems beyond the limits of common-sense, however, that Ferro, as the Company's

---

[125] *See* Oral Arg. Tr. 57:22–58:11 (Sept. 27, 2016).
[126] Pls' Answering Br. 47.

largest stockholder, would stop at negotiating a price of $1 billion for the Company

and ignore other willing buyers if the possibility of obtaining an even higher deal

price existed. Rather, to my mind, Ferro's waiver of the Consulting Agreement Fee

fully aligned his interest with the other stockholders of the Company.[127] I note that,

as a stockholder, Ferro would receive $188 million on the sale, dwarfing the

consulting fee.[128]

For the foregoing reasons, I find that it is not reasonably conceivable that

Ferro, assuming he was a controller, extracted any personal benefits. Therefore, the

stockholder vote here cleanses the Merger if that vote was fully informed.

### 2. The stockholder vote approving the Merger was fully informed.

A plaintiff alleging that a stockholder vote was inadequately informed to

cleanse a transaction must "identify a deficiency in the operative disclosure

document," which shifts the burden to the defendants to show that "the alleged

deficiency fails as a matter of law in order to secure the cleansing effect of the

---

[127] As to Plaintiffs' vague reference to post-closing "career prospects" that Ferro obtained for himself and members of the Board, Ferro did not personally obtain post-closing employment and the only director who did obtain post-closing employment with IBM was also a member of management and abstained from voting on the Merger. The Plaintiffs concede that retaining certain management was a condition placed on the deal by IBM. Retaining management, I note, is a "routine occurrence" under our law in deals of this type and generally should not be viewed with suspicion. *See Morgan v. Cash*, 2010 WL 2803746, at *5 (Del. Ch. July 16, 2010). As such, I find that these alleged "career prospects" enjoyed by others were not personal benefits to Ferro, and that he was not a conflicted controller.

[128] As a 26% (indirect) stockholder, Ferro was presumably entitled to $260 million on the $1 billon sale; this apparent discrepancy is not explained in the record.

25

vote."[129]  "[W]hen directors solicit stockholder action, they must 'disclose fully and fairly all material information within the board's control.'"[130]  Obviously, for a stockholder approval of a transaction to be meaningful, that vote must be based on an informed understanding of the transaction.  This explains this Court's solicitude in its jurisprudence regarding a fully informed vote.  "Fully informed" does not mean infinitely informed, however.  "The essential inquiry is whether the alleged omission or misrepresentation is material."[131]  Information will be found material if "from the perspective of a reasonable stockholder, there is a substantial likelihood that it significantly alters the total mix of information made available."[132]  Redundant facts, insignificant details, or reasonable assumptions need not be disclosed.[133]  Nor must information be disclosed simply because a plaintiff alleges it would be helpful, or interesting.[134]

In other words, for purposes of rebutting any cleansing effect here at the motion to dismiss stage, plaintiffs must sufficiently allege facts that make it reasonably conceivable that the disclosures were materially misleading in some

[129] *In re Solera*, 2017 WL 57839, at *8.
[130] *Id.* at *9 (quoting *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992)).
[131] *Id.* at *9.
[132] *In re Trulia, Inc. Stockholder Litig.*, 129 A.3d 884, 899 (Del. Ch. 2016) (internal quotation omitted).
[133] *See Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006).
[134] *See Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *10 (Del. Ch. June 30, 2014).

26

regard; thus leading to an uninformed vote.[135] The Plaintiffs have the pleading burden to allege material deficiencies; and I consider only the deficiencies alleged in the Complaint here.[136] Plaintiffs' alleged disclosure violations are contained within two broad categories: the summary of Goldman's financial analysis and Ferro's decision to waive the Consulting Agreement Fee contractually owed to him. The Plaintiffs also raise various other disclosure claims in their Complaint, such as failing to disclose in the Proxy that Ferro attempted to sell his shares in 2014.[137] The Plaintiffs do not address these points in their Answering Brief, so I consider them waived.[138]

The Defendants initially argue that the Plaintiffs should be precluded from pursuing any post-closing disclosure claims because—although the Plaintiffs had the opportunity to proceed before the merger—they failed to seek correction of the alleged deficient disclosures via pre-merger injunction.[139] The Defendants here make a policy argument that this Court should foster an incentive system to promote

---

[135] It is worth noting at the outset that the Plaintiffs do not contend that the Defendants failed to disclose the conflicts of interest they allege, with the exception of those discussed *infra*. *See Corwin*, 125 A.3d at 312 ("[I]f troubling facts regarding director behavior were not disclosed that would have been material to a voting stockholder, then the business judgment rule is not invoked.").

[136] *In re Solera*, 2017 WL 57839, at *8.

[137] Compl. ¶ 119.

[138] *See Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2007 WL 2982247, at *11 (Del. Ch. Oct. 9, 2007) ("The plaintiffs have waived these claims by failing to brief them in their opposition to the motion to dismiss.") (citing *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) (explaining "[i]t is settled Delaware law that a party waives an argument by not including it in its brief")).

[139] Defs' Opening Br. 18.

an informed stockholder vote. The Defendants argue that after *Corwin*, plaintiffs now have an incentive not to litigate disclosure claims before a stockholder vote but to wait until post-closing "to challenge the application of the business judgment rule,"[140] thus fostering post-closing litigation instead of promoting an informed vote, the legitimate goal of the litigation. As I have noted elsewhere, the preferred way of proceeding is for plaintiffs to bring these claims pre-closing to ensure that stockholders can exercise their right to a fully informed vote.[141] Damages arising from disclosure deficiencies can be remedied post-close, but the stockholders' right to a fully informed vote cannot.[142] In light of the evolving nature of our jurisprudence, I decline to consider these policy issues here, and assume that the Plaintiffs may proceed with these claims post-closing.

a. Summary of Goldman's Financial Analysis

The Plaintiffs allege defects in the disclosure regarding Goldman's financial analysis. "[S]tockholders are entitled to receive in the proxy statement a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."[143] This fair summary is just that, a summary.[144] Its essence is "not a

---

[140] *Id.* at 20.
[141] *See Nguyen v. Barrett*, 2016 WL 5404095, at *6 n.56 (Del. Ch. Sept. 28, 2016).
[142] *Id.* at *7.
[143] *In re Trulia*, 129 A.3d at 900 (internal quotations omitted).
[144] *Id.*

28

cornucopia of financial data, but rather an accurate description of the advisor's methodology and key assumptions."[145] "[D]isclosures that provide extraneous details do not contribute to a fair summary. . . ."[146] In other words, the summary must be sufficient for the stockholders to usefully comprehend, not recreate, the analysis.

The Plaintiffs allege in the Complaint that the Proxy 1) fails to disclose that Goldman treated SBC as a cash expense and 2) inadequately describes the present value of the Company's NOLs. The Plaintiffs also argue in their Answering Brief, but not in the Complaint, that the Unlevered Free Cash Flows (the "UFCFs") actually used by Goldman were not the UFCFs that the Proxy discloses that Goldman used.

### i. UFCF and SBC

The Plaintiffs' allegations concerning the UFCFs disclosed in the Proxy have been somewhat of a moving target throughout this litigation. The Plaintiffs first allege in their Complaint that Goldman understated Merge's value in its Discounted Cash Flow ("DCF") analysis by "atypically" treating SBC as a cash expense and that the Proxy fails to disclose this fact.[147] However, the Proxy discloses: (1) the Company's UFCF projections,[148] (2) that Goldman used these projections,[149] and (3)

---

[145] *Id.* at 901.
[146] *Id.*
[147] Compl. ¶¶ 102, 124.
[148] Proxy at 33–34.
[149] *Id.* at 30.

29

states that in creating these projections, management used GAAP earnings,[150] which, the Defendants point out, requires treatment of SBC as a cash expense.[151] The Plaintiffs argue that this is not adequate and the treatment of SBC as a cash expense should have been expressly disclosed. I disagree. Assuming for purposes of this argument that the accounting treatment of SBC would be material to stockholders, I find the disclosures here adequate. The Proxy discloses adjustments made to GAAP earnings in reaching the UFCF projections, but does not mention any adjustment for SBC despite discussing a handful of adjustments for other line-items. Generally, if a disclosure does not explicitly state that a Board took a certain action, a reader can infer that such action did not occur.[152] Thus, I find that the Proxy adequately discloses that Goldman treated SBC, consistent with GAAP, as a cash expense.

Subsequent to the filing of the Motion to Dismiss, presumably in light of the Opening Brief, the Plaintiffs have apparently changed their mind over Goldman's treatment of SBC, alleging *for the first time* in their Answering Brief that Goldman

---

[150] *Id.* at 34 ("Non-GAAP EBIT consists of GAAP earnings before interest and taxes plus restructuring and acquisition-related charges. . . . Unlevered free cash flow was calculated by adding back to tax-effected non-GAAP EBIT depreciation and amortization, adding or subtracting changes in working capital and subtracting capital expenditures and capitalized software.").

[151] *See* Defs' Reply Br. 9. *See also Shaev v. Adkerson*, 2015 WL 5882942, at *11 n.105 (Del. Ch. Oct. 5, 2015) ("Financial accounting standards are . . . subject to judicial notice . . . [s]uch accounting standards require same-period expensing of stock and option grants.") (citations omitted); (Statement of Financial Accounting Standards No. 123 (revised 2004) ("This Statement requires that the cost resulting from all share-based payment transactions be recognized in the financial statements."); Financial Accounting Standards Board, Accounting Standards Codification § 718-10-25-2 (requiring entities to "recognize the services received in a share-based payment transaction with an employee as services are received").

[152] *See In re Sauer-Danfoss Inc. Shareholders Litig.*, 65 A.3d 1116, 1132 (Del. Ch. 2011).

30

used a set of UFCF projections that instead treated SBC as a *non-cash* expense.[153] In making this latter argument in their Answering Brief, the Plaintiffs cite to a presentation to the Board (seemingly obtained in discovery in the Illinois Action) and allege that there were two different sets of UFCF projections included in this presentation.[154] One set of projections treated SBC as a cash expense, while the other did not. The Plaintiffs belatedly allege that, despite the Proxy's disclosure to the contrary, Goldman actually used the projection set that treated SBC as a *non-cash* expense.[155] In other words, the Plaintiffs allege that the Proxy contains not just a misleading or incomplete disclosure, but a false statement of fact.

As an initial matter, I note that Plaintiffs' allegations here rely heavily, if not entirely, on a final presentation to the Board by Goldman apparently obtained during discovery in the Illinois Action. This presentation is not contained in the Proxy, nor is it explicitly referenced in Plaintiffs' Complaint. The Plaintiffs contend that the presentation should be deemed to be implicitly incorporated by reference in the Complaint, and argue that the Defendants have conceded as much by contending, in the briefing, that the Plaintiffs must have relied on the presentation to construct their Complaint.[156] The fundamental problem here, however, is the fact that Plaintiffs'

---

[153] Pls' Answering Br. 25–26.
[154] *Id.*
[155] *Id.*
[156] *See* Pls' Supplemental Br. 3 n.2–3.

Complaint fails to mention these two cryptic UFCF projection sets, and failed to allege that Goldman used the set that treated SBC as a non-cash expense. In fact, Plaintiff's Complaint makes precisely the opposite allegation, that Goldman treated SBC as a cash expense, but failed to adequately disclose that fact.[157] That was the allegation the Defendants were required to address in the Motion to Dismiss; they did so, I have found, adequately. The Plaintiffs seek to shift ground and argue to the contrary, but may not do so based on the Complaint and the Motion to Dismiss. The Plaintiffs, alternatively, seek leave to amend their Complaint. However, Court of Chancery Rule 15(aaa) bars any such amendment here.[158] The Plaintiffs could have sought to amend upon receiving Defendants' Motion to Dismiss, but instead they chose to answer the Defendants' Motion and in doing so assert an additional, and contradictory, argument. Accordingly, I find no fault in the Proxy's disclosure of the UFCF projections used by Goldman.

The Plaintiffs also argue that the Board was required to disclose the Company's projections for SBC for 2015 through 2019, claiming that these projections are "material" for stockholders "to have a fair summary of the Company's historical and projected financials and the financial analyses performed

---

[157] Compl. ¶ 102.

[158] *See* Ct. Ch. R. 15(aaa) ("Notwithstanding subsection (a) of this Rule, a party that wishes to respond to a motion to dismiss under Rules 12(b)(6) or 23.1 by amending its pleading must file an amended complaint, or a motion to amend in conformity with this Rule, no later than the time such party's answering brief in response to either of the foregoing motions is due to be filed.").

by Goldman."[159]  Further, the Plaintiffs argue that without such information, "stockholders could not calculate the Company's actual UFCFs that were used in Goldman's DCF analysis and, therefore, could not accurately value Merge or its future prospects to determine whether to seek appraisal."[160]  However, "a disclosure that does not include all financial data needed to make an independent determination of fair value is not *per se* misleading or omitting a material fact . . . ."[161]  Under the facts alleged here, I find that the Proxy sufficiently provides a fair summary of the work performed by Goldman and further projections of SBC are not necessary.  The Proxy provides a detailed summary of Goldman's work, including projections for Revenue, Gross Profit, EBITDA, EBIT, Net Income, Earnings Per Share, and UFCF.[162]  Therefore, to my mind, it is not reasonably conceivable that the actual projections of SBC, while they might be of interest to stockholders, are necessary for a fair summary of Goldman's work in light of the disclosures actually made.

### ii. NOLs

The Plaintiffs allege that the Defendants failed to disclose the present value of Merge's NOLs, which according to the Plaintiffs was $0.58 per share.[163]  The

---

[159] Compl. ¶ 128.
[160] Pls' Answering Br. 32.
[161] *Nguyen v. Barrett*, 2015 WL 5882709, at *4 (Del. Ch. Oct. 8, 2015), *appeal refused,* 146 A.3d 1072 (Del. 2015).
[162] Proxy at 28–35.
[163] Pls' Answering Br. 32–33.  There is a slight discrepancy regarding the alleged value of the NOLs.  Plaintiffs' Complaint states the present value of the NOLs was $0.59 per share while their briefing gives a value of $0.58 per share.  *See* Compl. ¶ 102; Pls' Answering Br. 32–33.

33

Proxy does not disclose a separate value for NOLs but does state that "[t]he present value of net operating losses was calculated using a discount rate of 7.0%, which reflects our cost of debt."[164]  Again citing the final presentation Goldman made to the Board, which is not in the Proxy or explicitly referenced in the Complaint, the Plaintiffs assert that the NOLs were valued separately and that Goldman, using the 7.0% discount rate, reached a value for the Company's NOLs of $0.58 and incorporated this value into its DCF.[165]  According to the Plaintiffs, the present value of the Company's NOLs must be disclosed as a "key input" pursuant to *In re Netsmart Technologies, Inc. Shareholders Litigation*.[166]  The Plaintiffs contend that the present value of NOLs is important because of its "substantial impact" on the value reached in Goldman's DCF analysis.[167]  *Netsmart*, however, does not specifically address NOLs and merely states that "when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the *key inputs* and range of ultimate values generated by those analyses must also be fairly disclosed."[168]  The Defendants, to my mind, have provided such key inputs.  As previously discussed, the Proxy provides projections for Revenue, Gross Profit, EBITDA, EBIT, Net Income, Earnings Per

---

[164] Proxy at 30.
[165] Pls' Answering Br. 33.
[166] 924 A.2d 171 (Del. Ch. 2007); Pls' Answering Br. 33.
[167] Pls' Answering Br. 34.
[168] *In re Netsmart Techs., Inc. Shareholders Litig.*, 924 A.2d 171, 203–04 (Del. Ch. 2007) (emphasis added).

Share, and UFCF.[169]  Again, to repeat my reasoning regarding the separate projection of SBC above, "all financial data needed to make an independent determination of fair value" is not required; moreover, "[t]he fact that the financial advisors may have considered certain non-disclosed information does not alter this analysis."[170]  I fail to see how the separate disclosure of the present value of NOLs under the facts here would alter the total mix of information available to the stockholders given the detailed fair summary of Goldman's work already contained in the Proxy.  It may be of interest to stockholders, but its absence is not material.  Accordingly, I find the Proxy sufficient in its description of how Goldman calculated the Company's DCF value.

The Plaintiffs also argue that Merge's CFO himself did a valuation of the NOLs, calculating a value of $2 per share.  The Plaintiffs appear to base this allegation on an e-mail from the Company's CFO, again seemingly produced during discovery in the Illinois Action and used as an exhibit in deposing an employee of Goldman Sachs in that action.  In that deposition, which I find incorporated as integral to the Complaint,[171] the Goldman Sachs' employee explained that this $2.00 valuation was based on a potential transaction with a Canadian company and was

---

[169] Proxy at 28–35.

[170] *Nguyen v. Barrett*, 2015 WL 5882709, at *4 (Del. Ch. Oct. 8, 2015), *appeal refused,* 146 A.3d 1072 (Del. 2015).

[171] *See In re Morton's Rest. Grp., Inc. Shareholders Litig.*, 74 A.3d 656, n.3 (Del. Ch. 2013) (discussing incorporating depositions into a complaint). *See also* Compl. ¶ 14 (Plaintiffs referring to statements made by this Goldman Sachs employee).

specific to that transaction due to the possibility of "sell[ing] off the Canadian legal entities of Merge that actually have a significant tax yield."[172] Goldman rejected this assumption.[173] To my mind, disclosing a speculative valuation, limited to a hypothetical Canadian transaction, not relied on by the banker, would not be helpful to, and may instead mislead, stockholders.

### b. The Consulting Agreement Fee

The Plaintiffs argue the Defendants failed to disclose in the Proxy that Ferro waived the consulting fee "for the purpose of avoiding the creation of a special committee" and "not for the purpose of obtaining a price increase, as disclosed in the Proxy."[174] The Proxy discloses that the Board was considering a special committee "in light of" the Consulting Agreement Fee. The Proxy also discloses that, during negotiations

> Ferro also suggested that if IBM were willing to increase the price paid to all stockholders, [Ferro's Company] Merrick Ventures would consider waiving the contemplated consulting fee of $15 million. . . . [L]ater that evening, [IBM e-mailed Dearborn] indicating that IBM would raise its price . . . if Merrick Ventures would waive the consulting fee.[175]

The Plaintiffs argue that, even if true, these statements misled stockholders into thinking that Ferro's reason for the waiver was a price increase for stockholders, and

---

[172] Defs' Reply Br., Transmittal Aff. of D. McKinley Measley, Esq., Ex. 1, Sinclair Dep. at 64:6–66:13.
[173] *See id.*
[174] Pls' Answering Br. 35.
[175] Proxy at 23.

cite to Ferro's deposition testimony from the Illinois Action in which Ferro states that he and IBM "didn't want to do a special committee" and that IBM "did not want a special committee, which [Ferro] agreed with them on."[176] The Plaintiffs argue that this shows Ferro's subjective reason for waiving the Consulting Agreement Fee was to avoid the creation of a special committee. In other words, the Plaintiffs argue that Ferro's *intent* with respect to the waiver was not to increase the price of the Merger, as the Plaintiffs allege the Proxy misleadingly suggests, but was simply an effort by both IBM and Ferro to avoid the creation of a special committee.

"[D]isclosures relating to the Board's subjective motivation or opinions are not *per se* material, as long as the Board fully and accurately discloses the facts material to the transaction."[177] Put more simply, "[a]sking 'why' does not state a meritorious disclosure claim" under our law.[178] Here, the Proxy disclosed that the Board was considering a special committee "in light of" the Consulting Agreement Fee, and disclosed the fact that Ferro waived this fee.[179] The Proxy does not disclose, and was not required to disclose, Ferro's subjective motivation for waiving the Consulting Agreement Fee. It does not seem reasonably conceivable to me that an

---

[176] Transmittal Aff. of Derrick B. Farrell, Esq., Ex. C, Ferro Dep. at 62.

[177] *In re MONY Grp., Inc. S'holder Litig.*, 853 A.2d 661, 682 (Del. Ch. 2004).

[178] *See In re Sauer-Danfoss*, 65 A.3d at 1131.

[179] *See* Compl. ¶ 89, Proxy at 23 ("[The Board] was considering the formation of a special committee to negotiate the proposed merger with IBM *in light of* the fact that, with the changed price in the transaction, the Merrick consulting agreement would provide for a $15 million payment to Merrick Ventures.") (emphasis added).

additional disclosure surrounding Ferro's alleged subjective motivation for waiving the Consulting Agreement Fee—a waiver that benefited all stockholders pro rata—would "alter the total mix of information" available to those stockholders in deciding whether to approve the Merger. Accordingly, I find that the Board provided sufficient information about Ferro's waiver of the Consulting Agreement Fee.

The Plaintiffs also argue that the Defendants failed to disclose in the Proxy that Ferro was willing to waive the Consulting Agreement Fee "for any other potential purchaser and not just IBM."[180] The Plaintiffs' argument seems to be that failure to disseminate such a willingness on Ferro's part depressed the sales price, by failing to so inform hypothetical third-party purchasers. I note that a Board owes no disclosure duty to third parties such as other potential purchasers, especially speculative potential *unknown* purchasers such as here. Moreover, I am not convinced that a broad public announcement of Ferro's willingness to waive his fee for any bidder would necessarily support a higher sales price.[181] More to the point, however, for purposes of adequate disclosure to cleanse, disclosure to the

---

[180] Pls' Answering Br. 35.
[181] The Plaintiffs argue that the market would consider the $15 million Consulting Agreement Fee as additional to the $26 million termination fee, effectively creating a termination fee of $40 million in the minds of potential bidders. This is dubious, but if true resulted in an aggregate breakup fee of under 4%, which is not facially unreasonable. Plaintiffs' argument here would carry more weight had there been another known bidder waiting in the wings from whom the Defendants withheld Ferro's broad willingness to waive his consulting fee. Such facts are not alleged here, however. In any event, the issue goes to process claims, which I need not reach given my decision here.

stockholders of Ferro's subjective intent with respect to hypothetical bidders is not material to the stockholders.

*B. The Business Judgment Rule Applies to the Merger*

Based on the foregoing, the Merger was approved by an uncoerced vote of a majority of the Company's disinterested stock, without the presence of a controller who extracted personal benefits. The Plaintiffs allege that the vote was insufficiently informed; I find that the Defendants have met their burden, through reference to the available record, to demonstrate that the vote was informed. Accordingly, the business judgment rule applies to the Board's decision to approve the Merger. Since the Plaintiffs do not allege waste with respect to that decision, the Complaint must be dismissed under 12(b)(6) for failure to state a claim.

### III. CONCLUSION

For the reasons discussed above, Defendants' Motion to Dismiss is granted. To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.